IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<table>
<tr><td>VINCENT T. MERCER,</td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>CIVIL NO.: WDQ-13-0050</td></tr>
<tr><td>PHH CORPORATION,</td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Vincent T. Mercer, an African-American, sued PHH Corporation for discriminatory termination under 42 U.S.C. § 2000e-2, and retaliatory termination under 42 U.S.C. § 2000e-3. Pending is PHH's motion for summary judgment. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the following reasons, the motion will be granted.

I. Background[1]

PHH Arval ("PHH") is a wholly owned subsidiary of PHH Corporation and "one of the leading commercial fleet management companies in North America." ECF No. 19-3 at ¶ 2 (hereinafter "Ennis Aff."). PHH "provides outsourced vehicle fleet management solutions to corporate clients." *Id.* PHH employees work in call centers that assist drivers, repair shops, and suppliers who are having problems with a corporate client's vehicles. *See* ECF No. 19-7 at ¶¶ 2-4 (hereinafter "Bolin Aff.").

A. Contract with Budget and the BTR Call Center

In January 2005, PHH entered into a contract with Avis-Budget Rent-A-Car Corp. *Id.* Under the contract, PHH would provide 24/7 roadside service for Budget Truck Rental ("BTR") throughout the year. *Id.* The contract had a number of different metrics (i.e., measures of PHH's performance), including call abandon rate and max wait time. *See* ECF No. 19-11 at 1

---

[1] The facts are taken from the complaint, ECF No. 1; PHH Corporation's motion, ECF No. 19; Mercer's opposition, ECF No. 23, PHH Corporation's reply, ECF No. 27, and their supporting exhibits.

   In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In several instances, Mercer makes factual statements and conclusions that are unsupported by any evidence. The Court will give no weight to unsupported factual conclusions. *See* Fed. R. Civ. P. 56(c); *Jarvis v. Analytical Lab. Serv., Inc.*, No. RWT 10cv154, 2011 WL 3680257, at *4 (D. Md. Aug. 19, 2011).

(Investigation Report by Ellen Quinn-Hamlin).  "One of the most important" metrics was the Average Speed of Answer ("ASA"), which measured the time it took a PHH call center agent to answer a phone call.  *See id.*; Bolin Aff. at ¶ 6. PHH agreed to keep the ASA to 120 seconds.  Bolin Aff. at ¶ 6.

Before 2005, PHH had a single call center for all of its contracts -- the Vehicle Maintenance Assistance ("VMA") call center.  *See* ECF No. 19-1 at 10-11; ECF No. 19-13 at 17:19, 26:17-28:4 (hereinafter "Mackin Dep.")  To fulfill their contract commitments, PHH created an additional BTR call center.  *Id.* When a caller contacted the BTR call center, he was routed to an automated system to identify himself as a driver, vendor, or BTR employee.  Bolin Aff. at ¶ 4.  Based on the caller's response, the call was routed to one of three extensions or "skills."[2]  *Id.* About 80% of the incoming calls were from BTR drivers having trouble with their trucks.  ECF No.19-6 at 42:3-13 (hereinafter "Mercer Dep.").  When the caller was waiting for a PHH agent to answer his call after routing, the call was said to be "in the queue."  *Id.* at ¶6.

After the call was in the queue, a PHH agent was supposed to answer the call within two minutes and address the caller's problem.  Bolin Aff. at ¶ 4-6.  The agent was generally meant to

---

[2] Driver calls were routed to Skill 296, BTR employees were sent to Skill 298, and vendor and supplier calls were routed to Skill 20.  Bolin Aff. at ¶ 4.

handle a call on her own.  *See id.*; Mercer Dep. 43:14-46:22, 100:14-101:22.  The call was only transferred to another PHH employee if the problem was particularly technical or complex, the caller was unhappy, or authorization was required.  *See id.*; ECF No. 19-12 at 20:4-12 (hereinafter "Nehmsmann Dep.").  Skill 427 was an internal extension "reserved for calls requiring more advanced and complex driver and vehicle needs."  Bolin Aff. at ¶ 4.  "Before transferring a call to [S]kill 427, an agent was required to engage the caller and try to resolve the issue on their own."  *Id.*

PHH would report to BTR about its performance at the call center, including the ASA number.  *See Id.* at ¶25.  The BTR contract was set for renewal in 2012.  ECF No. 19-11 at 2.

B. Mercer's Position with PHH

In 1999, Mercer began working for PHH in the VMA call center as a VMA agent or "generalist."  Mercer Dep. at 29:12-20.  Mercer received calls from suppliers who would recommend repairs and upgrades to clients' vehicles.  *Id.* at 30:1-13.  In January 2001, Mercer resigned to work for a previous employer.  *Id.* at 32:4-7.  A year later, Mercer returned to the same position with PHH because PHH could provide him the flexible schedule he needed.  *Id.* at 33:14-35:21.  After two or three years, Mercer became a VMA team leader.  *Id.* at 36:17-21.  In this position, Mercer

4

oversaw a group of 12 other generalists and technicians.[3]   Mercer

Dep. at 36:17-39:17.

   In November 2006, Mercer became a supervisor of the BTR call

center.  *Id*. at 36:22-37:3.  The other supervisor of the BTR call

center was Louis Nehmsmann, a white male.  *Id*. at 40:2-41:11.

Mercer's and Nehmsmann's responsibilities were "absolutely"

similar.  *Id*. at 60:18-22 ("Nehmsmann was a supervisor like

myself.  We were peers.  We shared responsibilities, we worked

side by side."); Nehmsmann Dep. at 34:19-25.  Mercer and

Nehmsmann oversaw 40 to 43 agents in the BTR call center.  Mercer

Dep. at 40:2-41:11.  Mercer and Nehmsmann's supervisor was Bob

Carvell, the call center manager.  *See id*. at 56:19-58:2.

Carvell reported to Kim Bolin, the Vice President of the Contact

Center.  Nehmsmann Dep. at 34:13-15.  Chris Koutek and Wilrosea

Moncur were the two team leaders who worked under Mercer and

Nehmsmann.  Mercer Dep. at 61:14.  From 2004 to March, 2009,

Mercer consistently received positive scores on his performance

evaluations.[4]

---

[3] Technicians were PHH agents who had more specialized expertise
than generalists.  *See* Mercer Dep. at 36:17-39:17.

[4] The performance evaluations rated employees on a 0 to 5 scale
in six categories.  *See* ECF No. 23-11.  Mercer never received
below a 3 ("Consistently meets expectations"), and on his March
2009 review, his lowest score was a 4 ("Usually exceeds
expectations").  *Id*.

In 2007, in addition to his role as supervisor, Mercer joined PHH's Diversity Committee. Mercer Dep. at 64:9-66:22. The Diversity Committee was created in 2007 to "bridge[] the gap" between lower level employees and management. *Id.* In 2008, Mercer became the committee's chairman. *Id.*

While Mercer was on the Diversity Committee, PHH established a policy of considering qualified minority candidates for job openings. *Id.* PHH also took suggestions from the committee about how to create a positive work environment for employees. *Id.* at 67:2-10. Mercer believed that PHH valued the committee's feedback and supported the committee. *See id.* at 67:2-68:22. Mercer was never treated differently by a PHH manager or supervisor because of his position on the committee. *Id.*

C. March 2010 Town Meeting Incident

On March 11, 2010, the new CEO of PHH Corporation, Jerome Selitto, held a "town hall meeting" at PHH headquarters in Sparks, Maryland. *See* Ennis Aff. at ¶¶ 9-11. During a speech about where PHH was headed and his leadership style, Selitto referred to slaves rowing a ship, and monkeys climbing a tree to reach a banana. *See* ECF No. 19-1 at 25-16; Mercer Dep. at 191:12-192:12. After the meeting, Mercer received several complaints from employees about Selitto's comments. Mercer Dep. at 197:5-12.

Mercer contacted Rita Ennis, the Senior Vice President of Human Resources.[5]  *Id.*  Mercer suggested that Selitto meet with the Diversity Committee about the comments.  *Id.*  Ennis supported the idea and contacted Selitto to inform him "that his remarks had offended," and he should meet with the committee.  *Id.* at 202:10-11, 203:-9; Ennis Aff. at ¶ 11.

Mercer also told George Kilroy, PHH's president, about the complaints.  Mercer Dep. at 203:10-204:5.  "[Kilroy's] response was positive."  *Id.*  He "wanted to be kept abreast," and asked Mercer for a "debriefing" following Selitto's meeting with the committee.  *Id.*

On April 22, 2010, Selitto met with the committee.  Ennis Aff. at ¶ 13.  Mercer and Ennis attended the meeting.  *Id.* According to Selitto, his comments had been taken out of context. *See* Mercer Dep. at 204:17-22; ECF No. 19-21 at 33:15-35:20, 41:1-42:12 (hereinafter "Selitto Dep.").  He asserted that his comment about the slave ship was a reference to the movie *Ben Hur* because he was trying to show PHH employees that he was not a slave driver.  Selitto Dep. at 33:15-35:20.  Selitto also stated that his story about the monkeys trying to reach a banana was a reference to a psychological study, and was meant to show employees that he wanted PHH employees to find creative solutions

---

[5] Mercer described Ennis as "an integral part of [the] Diversity Committee."  Mercer Dep. at 216:8-11.

to problems.  *Id*. at 41:1-42:12.  Mercer asserts that during the meeting, Selitto was defensive and dismissive.  Mercer Dep. at 204:17-22.  Selitto apologized to the committee and stated that he would be in his office for the rest of the day if anyone wanted to talk.  *Id*. at 41:1-205:21; Ennis Aff. at ¶ 13.

After the meeting, Mercer went to Selitto's office.  Mercer Dep. at 206:15-208:7.  Mercer explained that Selitto's comments had a negative effect on morale.  *Id*.  Mercer suggested that the best solution would be for Selitto to issue a company-wide apology.  *Id*.  Selitto agreed that the apology was a good idea and asked Mercer to draft the apology.[6]  *Id*.

Mercer, Ennis, and another Diversity Committee member drafted an apology email.  *Id*. at 208:10-21, 220:5-6.  At some time in the apology drafting process, Mercer alleges that Ennis told him during a phone conversation, "if it's a fight you want, it's a fight you will get."  *Id*. at 209:9-22.  However, Mercer could not remember the context of the conversation, and did not ask Ennis to explain the comment.  *Id*.  Selitto thought that the draft "was excellent work," and thanked Mercer for his help. Mercer Dep. at 223:19-21; Selitto Dep. at 138:13-16.  On May 13, 2010, Selitto sent out the company-wide apology email.  ECF No. 19-22 (apology email).

---

[6] According to Mercer, Selitto replied, "You know what, you're right. Write down what you just said and get it back to me." Mercer Dep. at 206:15-208:7.

Mercer had no further contact with Selitto, and he did not complain to anyone else about Selitto's comments. *See* Mercer Dep. 220:18-223:19. Additionally, Mercer does not know if Bolin or any of his direct supervisors were aware of his involvement with the apology.[7] *See id.*

D. "Call Flipping" Incident and Mercer's Termination

In early 2010,[8] Nehmsmann and Mercer had concerns about the BTR call center's staffing. *See* ECF No. 24-1 at 3 (Summer 2010 Contingency Plan). They were worried that they did not have enough people to handle the volume of BTR calls that would come in during the summer. *See id*; Mercer Dep. at 98:1-99:17; Nehmsmann Dep. at 43:1-47:4. To fix this problem, the BTR department created a "triage" or "contingency" plan. Mercer Dep. at 105:5-21; Nehmsmann Dep. at 50:15-51:18. When call volume was too high for the BTR agents to handle, VMA call center agents would take vendor and BTR employee calls, get as much information as possible about the problem from the caller, and a BTR agent would call back within 30 minutes to fix the problem. ECF No. 24-1 at 3; Mercer Dep. at 105:5-21. However, even in these high volume periods, driver calls "need[ed] to be handled by dedicated

---

[7] The only people involved in the process were Ennis, Selitto, and the members of the Diversity Committee. *See* Mercer Dep. 220:180-223:19.

[8] The parties do not provide dates when this initial planning process occurred.

BTR agents."  ECF No. 24-1 at 3.  The process was approved by
Carvell; however, he was not a fan of the system.  Mercer Dep. at
111:1-9.  On May 26, 2010, Mercer sent an email to the BTR team
describing the contingency plan.[9]  ECF No. 24-1.

In June 2010, Carvell left PHH.  Bolin Aff. at ¶ 5.  Timothy
Mackin, the manager of the VMA call center, became the interim
manager of the BTR call center while PHH searched for a
replacement.  *Id*.; Mercer Dep. 56:10-59:2.  From June 14, 2010 to
July 11, 2010, Mackin served as interim BTR manager.  *Id*.  On
July 11, 2010, PHH hired Charles Hogarth as Contact Center
Manager.  ECF No. 19-14 at ¶ 1 (hereinafter "Hogarth Aff.").

While Mackin was manager, Nehmsmann developed a new plan for
handling the BTR call center's problems during high volume
periods.  Mercer Dep. at 106:8-109:8.  A BTR agent would answer a
call, ask for the caller's name, and then say he was transferring
the call to a "dispatcher."  ECF No. 19-10 (June 18, 2010 email
from Nehmsmann to Mercer, Moncur, and Koutek); Mercer Dep. at
134:10-137:21.  The BTR call center did not have a dispatcher.

---

[9] Throughout his opposition, Mercer asserts that this email,
which was also sent to his superiors, is proof that PHH knew of
and approved the call flipping scheme.  *See, e.g.*, ECF No. 23-1
at 5-6.  However, nothing in the email or its attachment mentions
call flipping.  ECF No. 24-1 at 3.  The plan only discusses how
VMA call center employees would take some BTR calls, and BTR
agents would have to call back.  *Id*.  Additionally, in his
deposition, Mercer admitted that "triage" was an entirely
different process from call flipping.  Mercer Dep. at 105:5-21,
106:8-108:5.

Mercer Dep. at 134:10-137:21.  Instead, the agent transferred the call to Skill 427, the extension for complex calls.  *Id*. at 134:1-9.  This would place the caller at the end of a new queue. *Id*. at 108:6-109:8, 134:1-137:21.  The caller would then wait in Skill 427's queue until an agent was available, sometimes over 50 minutes.  ECF No. 19-19 at ¶ 4 (hereinafter "Hahn Aff.").  Nehmsmann called the process "call flipping."  Nehmsmann Dep. at 67:17-68:7.

Nehmsmann's plan differed from the contingency plan.  First, the initial agent did not get any basic information from the caller or explain to the caller the volume of calls, and to expect a call back within a half hour.  *See* ECF No. 19-10; Mercer Dep. at 108:6-109:8, 134:1-137:21.  Second, Nehmsmann's plan applied to driver calls as well.  *See id*.

The entire purpose of the new plan was to artificially decrease the ASA time.  *See* Mercer Dep. at 108:6-109:8; Nehmsmann Dep. at 47:4-5.  Once the first agent picked up the phone, even if it was only for a few seconds, the ASA time was calculated. *See* Mercer Dep. at 108:6-110:2.  The additional time spent on hold on Skill 427 was not included in the ASA.  *See id*.

Nehmsmann discussed the plan with Mercer who "was not a fan" of the idea, but agreed that it was the only solution.  *See id*. at 113:9-10, 114:5-11.  Nehmsmann and Mercer agree that the plan deceived their client BTR because it altered the ASA.  *See* Mercer

11

Dep. at 117:20-121:18 ("Budget would not have been a fan of what was going on with that."); Nehmsmann Dep. 43:1-47:4.

Nehmsmann and Mercer allege that the call flipping plan was approved by Mackin during a production meeting with the supervisors of the BTR and VMA call centers.[10]  *See* Mercer Dep. at 114:8-14; Nehmsmann Dep. 43:1-47:4.  Mercer alleges that Mackin told him that the plan was communicated upward to Bolin.  Mercer Dep. at 119:1-22.  Nehmsmann sent emails to Chris Koutek, Wilrosea Moncur, and other BTR staff directing them to flip calls.  *See* ECF No. 19-10.  Mercer was copied on many of these emails, but Mackin and Bolin were not.  *Id.*

In mid-July 2010, Danny Hahn, a PHH quality-control analyst, noticed some discrepancies on the BTR call center logs -- many calls coming into the call center were lasting less than 30 seconds.[11]  Hahn Aff. at ¶ 3.  Hahn reviewed the BTR call center's

---

[10] Mackin and Michele Roberts (a VMA supervisor) deny that call flipping was ever discussed at a production meeting.  ECF No. 19-11 at 7; Mackin Dep. at 90:15-20.  Mercer also alleges that Roberts's account of this meeting, reflected in Quinn-Hamlin's investigation report, shows that call flipping was an accepted industry-wide practice.  *See* ECF 23-1 at 9.  However, the report cited by Mercer only states that Roberts mentioned "*Ford's* approach stating that she did not agree with it and that this would be *terrible customer service*."  ECF No. 19-11 at 7 (emphasis added).

[11] There are some inconsistencies about why Hahn originally examined the BTR call center's records.  In his affidavit, Hahn states that he was just performing his normal job of "review[ing] calls made by agents in the [BTR] and [VMA] call centers for quality discrepancies."  Hahn Aff. at ¶ 2.  In her investigation

June 2010 reports, and noticed that some agents repeatedly had very short calls. *Id.* at ¶ 4. Hahn listened to the recordings of some of these calls. *Id.* The agents would pick-up, introduce themselves, and then tell the callers the call was being forwarded to a dispatcher. *Id.* Some calls would then wait in the queue for 40 to 50 minutes. *Id.* Hahn also discovered that agents were "blind transferring" calls -- picking up the line and immediately transferring the call to Skill 427 without even speaking to the caller. *Id.*

Hahn "thought [he] found something inappropriate," so he went to Mercer to report the issue. *Id.* at ¶¶ 5-7. According to Hahn, Mercer said, "I got it," but seemed dismissive. *Id.* Mercer alleges that he told Hahn that Mackin had approved the process. ECF No. 23-17 at ¶¶ 8-9 (hereinafter "Mercer Aff."). Hahn reported the call flipping to his supervisor Dan Robbins. Hahn Aff. at ¶ 7. Robbins suggested that Hahn inform Hogarth of his findings. *Id.*

On July 23, 2010, Hogarth met with Robbins and Hahn to discuss Hahn's observations. Hogarth Aff. at ¶ 4; ECF No. 19-11

---

report, Quinn-Hamlin first states that Hahn was conducting regular "quality phone monitoring," but later stated that Hahn "was asked by Kim Bolin to conduct quality phone monitoring for the BTR department beginning late June." ECF No. 19-11 at 1-2. Bolin does not mention asking Hahn to look at the BTR call center in her affidavit. *See* ECF No. 19-7.

Mercer cites this inconsistency as proof that Bolin initiated the investigation as retaliation for Mercer's comments about Selitto. ECF No. 23-1 at 12-13.

at 2.  Hogarth immediately met with Nehmsmann and Mercer.  *Id.*
Nehmsmann and Mercer admitted knowing about transferring calls to
Skill 427.  *See* ECF No. 19-11 at 2; Mercer Dep. at 170:18-19.
However, they were surprised about the blind transfers.  *See* ECF
No. 19-11 at 2; Mercer Dep. at 150:4-22.  They informed Hogarth
that Mackin had approved the process.  *See* ECF No. 19-11 at 2;
Mercer Dep. at 170:18-173:4.  "[T]hey could not confirm whether
or not they had informed Kim Bolin (yet they thought they had)."
ECF No. 19-11 at 2; *see also* Mercer Dep. at 119:1-22 (Mackin told
Mercer that the plan had been communicated upward to Bolin, but
Mercer did not know whether it had been).

Hogarth and Robbins spent the next two days reviewing the
BTR call center's files and data.  Hogarth Aff. at ¶ 5.  Hogarth
discovered that between June 1, 2010 and July 25, 2010, 5,045
calls were transferred to Skill 427.  *Id.*  The ASA on these calls
was 5 minutes 51 seconds, with a maximum wait time of 54 minutes
and 5 seconds.  *Id.*  Additionally, the number of these calls that
were abandoned or dropped was almost three times the BTR call
center's normal rate.  *See* ECF No. 19-11 at 3.  The results
showed that the ASA rates reported to BTR for June and July were
significantly skewed.  *See* Hogarth Aff. at ¶ 6. ("[O]nce it was
corrected to account for the wait time spent back in the queue,
the ASA for June 2010 increased from 128 seconds to 166 seconds -

14

- a 30% increase.  Likewise, ASA for July 2010 had to be restated
and increased from 147 to 197 seconds -- a 34% increase.").

On July 28, 2010, Hogarth met with Nehmsmann "to learn more
and to attempt to better understand how the initial triage
process evolved to what it became, who was aware, and where the
direction came from."  ECF No. 19-11 at 3.  Nehmsmann explained
where the idea came from, and that it had been approved.  *Id.*  He
also stated that he and Mercer had discussed the idea with Bolin.
*Id.*  Hogarth also met with Mackin.  Hogarth Aff. at ¶ 13.  Mackin
"insisted . . . that he was not aware that calls were being
answered and then placed back in the queue to be answered by
another agent.  He also insisted that he did not authorize the
process."  *Id.*  Hogarth believed that Mackin was "genuinely
surprised to hear that flipping was occurring" because of "his
reaction."  *Id.*

Bolin was on vacation from July 26, 2010 to July 30, 2010.
*Id.*  On July 28, 2010, Hogarth sent Bolin an email asking about
her involvement with the call flipping process.  Hogarth Aff. at
¶ 14.  On July 29, 2010, Hogarth and Bolin spoke on the phone,
and Bolin stated that she had no knowledge of the call flipping
process.  *Id.*  Bolin told Hogarth to put a stop to the call
flipping.  *Id.*  Hogarth relayed this message to Nehmsmann and
Mercer.  Mercer Dep. at 170:18-173:4.  Hogarth, Nehmsmann,
Robbins, and Mercer planned and implemented a short-term triage

15

process until the staffing problem was solved.   ECF No. 19-11 at

3-4.

On August 3, 2010, Bolin met with Hogarth and Ellen Quinn-

Hamlin.[12]  Bolin Aff. at ¶ 10.  They determined that Bolin and

Quinn-Hamlin would conduct an internal investigation.  *See id.*;

ECF No. 19-11 at 4.

Between August 8, 2010 and August 12, 2010, Bolin and Quinn-

Hamlin interviewed six people about the call flipping process:

Nehmsmann, Mercer, Mackin, Roberts, Moncur, and Koutek.  *See* ECF

No. 19-11 at 4-8.  During his interview, Mercer stated that he

and Nehmsmann created the call flipping process to "not make

ourselves look like idiots."[13]  *See id.* at 5-6.  He also knew the

process created misleading ASA numbers, and that it was not what

BTR was expecting.  *See id.*; Mercer Dep. 175:6-184:7.  In his

interview, Mackin denied having any involvement or knowledge in

the call flipping process.  *See* ECF No. 19-11 at 6-7.  Because

Mackin was not on any of the call flipping emails, there was no

proof of his approval of the process, and he had a reputation as

"a straight shooter," Bolin and Quinn-Hamlin believed Mackin's

version of events.  *See id.*; Bolin Aff. at ¶ 15.

---

[12] Quinn-Hamlin was a Senior Manager of Human Resources.  Bolin
Aff. at ¶ 9.

[13] During his deposition, Mercer clarified that "ourselves"
referred to PHH.  Mercer Dep. at 175:56-177:11.

On August 24, 2010, Bolin, Quinn-Hamlin, Ennis, Pam Walinski (Vice President of Customer Service), and Tom Keilty (Senior Vice President Customer and Vehicle Services and Chief Operating Officer) met to discuss the investigation.  Ennis Aff. at ¶ 5. They "decided to fire [] Mercer and [] Nehmsmann because evidence showed that the two of them had jointly participated in a scheme . . . for the purpose of manipulating the [ASA] numbers that were reported to BTR," which was a breach of PHH's Code of Ethics.  *Id*. at ¶6.  Selitto did not have any part in Mercer's termination, and did not know until March 2011 that Mercer had been terminated.  *See id*. at ¶ 15; Mercer Dep. at 187:2-4.

On August 26, 2010, Ennis issued nearly identical termination letters to Mercer and Nehmsmann.  *See* ECF Nos. 19-4, 19-5.  The letters stated that Mercer's and Nehmsmann's terminations were because of their "involvement in the misrepresentation of the [BTR] Average Speed of Answer statistics for the months of June and July, 2010."  *Id*.  Mercer's duties were assumed by Debra Smith, an African American female.  Ennis Aff. at ¶ 8.

PHH told BTR about the call flipping situation and corrected the ASA numbers for June and July.  Bolin Aff. at ¶ 25.  On February 28,2012, BTR chose not to renew the contract.  *Id*.

E. Procedural History

On March 2, 2011, Mercer filed a charge of discrimination with the Maryland Commission on Human Relations.  ECF No. 19-23. In his charger, Mercer decribed having a "discussion" with Selitto about his comments following the town meeting, and alleged that he "was discriminated against and subject to retaliation for engaging in a protected activity . . . ."  *Id.* On the form, Mercer only checked the box labeled "retaliation," and not the "race" discrimination box.  *Id.*

On October 4, 2012 the EEOC issued Mercer a right to sue letter.  ECF No. 1 at ¶ 13.  On January 4, 2013, Mercer sued PHH Corporation "as a result of [the] Defendant's discrimination against [the] Plaintiff by retaliating against him for engaging in a protected activity . . . ."[14]  *Id.* at ¶ 1.  On March 19, 2014, PHH Corporation moved for summary judgment.  ECF No. 19. On April 21, 2014, Mercer opposed the motion.  ECF No. 23.  On May 8, 2014, PHH Corporation replied.  ECF No. 27.

---

[14] In the complaint, Mercer did not cite the statutory provisions under which he was suing.  *See* ECF No. 1.  In his opposition to PHH's motion for summary judgment, Mercer states that he has a retaliation claim under 42 U.S.C. § 2000e-3, and a substantive race discrimination claim under 42 U.S.C. § 2000e-2.  *See* ECF No. 23-1 at 12-13, 18-19.

II. Analysis

  A. Legal Standard

    1. Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[15]  In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [her] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

---

[15] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

B. Methods of Proving Discrimination

A plaintiff can prove his employer's discrimination through one of two methods. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). These methods apply equally to substantive discrimination claims and Title VII retaliation claims. *See Kapel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998). First, a plaintiff may use "any direct or indirect evidence relevant to and sufficiently probative of the issue," under "ordinary principles of proof." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (internal quotation marks omitted). To avoid summary judgment, the plaintiff must produce "direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (internal quotation marks omitted).

Absent direct evidence of discrimination, the Court applies the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). If he does, "a presumption of illegal discrimination" arises, and the burden of production shifts to the employer to

articulate a nondiscriminatory reason for its adverse decision. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

"If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981), and the *McDonnell Douglas* framework "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The plaintiff must then prove by a preponderance of the evidence that "the proffered reason was not the true reason for the employment decision," and that the true reason was discrimination. *Burdine*, 450 U.S. at 256. He may do this directly or indirectly, by "persuading the court that a discriminatory reason more likely motivated the employer" or by showing that the employer's explanation is "unworthy of credence." *Id.*

C. Mercer's Race Discrimination Claim

A Title VII plaintiff must first "exhaust [his] administrative remedies by bringing a charge with the EEOC." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir.2000). "The scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents." *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir.2009). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be

maintained in a subsequent Title VII lawsuit." *Id.* (internal quotation marks omitted). "[A] failure by the plaintiff to exhaust administrative remedies . . . deprives the federal courts of subject matter jurisdiction over the claim." *Id.*

In his charge of discrimination, Mercer recounted the facts surrounding the March 2010 town hall meeting, and alleged that he was retaliated against because of his request for an apology. *See* ECF No. 19-23. Further, Mercer only checked the "retaliation" box on his charge of discrimination. *Id.* He did not check the "race" box. *Id.*

Accordingly, the Court lacks subject matter jurisdiction over his race discrimination claim because Mercer failed to exhaust his administrative remedies for that claim. *See Jones v. Calvert Grp, Ltd.*, 551 F.3d 297, 301 (4th Cir. 2009) ("Indeed, she checked only the 'retaliation' box on her EEOC charge . . . The district court therefore properly determined that Jones failed to exhaust her administrative remedies . . . ."); *Sewell v. Strayer Univ.*, 956 F. Supp. 2d 658, 668-69 (D. Md. 2013) (checked only "retaliation" box); *Cohens v. Md. Dept. of Human Res.*, 933 F. Supp. 2d 735, 743 (D. Md. 2013) (failure to check "retaliation" box).

The Court will dismiss Mercer's substantive discrimination claim for lack of subject matter jurisdiction.

D. Mercer's Retaliation Claim

To establish a *prima facie* case of retaliation, Mercer must show 1) that he engaged in a protected activity; 2) his employer took an adverse employment action against him; and 3) there was a causal link between the protected activity and adverse action. *Navy Fed. Credit Union*, 424 F.3d at 406.  PHH argues that it is entitled to summary judgment because Mercer has failed to show a causal link, and it has provided a non-discriminatory reason for Mercer's termination.  *See* ECF No. 19-1 at 28-29.  Mercer asserts that he has established a *prima facie* case of retaliation and has shown pretext.  *See* ECF No. 23-1 at 11-12.

"Knowledge of [protected activity] is essential to a retaliation claim."  *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998).  If a plaintiff cannot establish that the decision-maker had knowledge of the protected activity at the time of the adverse employment action, his retaliation claim must fail.  *See Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998).

Mercer has failed to cite any evidence upon which a reasonable jury could conclude that those who terminated him knew about his complaints about Selitto.  Selitto was not involved in the decision to fire Mercer, and did not know Mercer had been

terminated until the EEOC complaint was filed.  *See* Ennis Aff. at ¶ 15; Mercer Dep. at 187:2-4.  Additionally, Mercer stated that he did not know if Bolin or any one who made the ultimate decision to terminate his employment with PHH knew of his involvement with Selitto's apology email.  *See* Mercer Dep. 220:18-223:19.  Mercer never told them, and he has failed to cite any evidence in the record that establishes a material issue of fact on this matter.[16]  *See id.*; ECF No. 23-1 at 9-10.

Additionally, PHH has provided a nondiscriminatory reason for Mercer's termination -- Mercer's involvement with the call flipping scheme.  Mercer argues that the investigation was pretextual because Bolin failed to recuse herself, and he was terminated four months after requesting that Selitto apologize. ECF No. 23-1 at 12.

---

[16] The only person involved in both incidents was Ennis, who Mercer stated was "an integral part of [the] Diversity Committee."  Mercer Dep. at 216:8-11.  Mercer does not remember the context of Ennis's statement "if it's a fight you want, it's a fight you will get," *id.* at 209:9-22, and Ennis was not a part of the initial investigation of the call flipping, ECF No. 19-11. Looking at all the facts in the light most favorable to Mercer, nothing on the record establishes that Ennis had a discriminatory motive.  *See Muldrow v. Schmidt Baking Co.*, No. WDQ-11-0519, 2012 WL 4838500, at * 10 (D. Md. Oct. 5, 2012) ("The plaintiff must then demonstrate that the employer's reason was mere pretext for retaliation by showing 'both that the reason was false *and* that discrimination was the real reason for the challenged conduct.'") (quoting *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (internal quotation marks omitted)).

Although "close temporal proximity between the time [his] employer learned about [his] protected activity and [his] discharge" may be sufficient for a plaintiff to establish a nexus for a *prima facie* case,[17] Mercer's allegations do not establish pretext.[18] Mercer admits that the call flipping scheme did not begin until June, after his involvement with Selitto. *See* Mercer Dep. at 106:8-108:5. PHH has always been consistent about the reason for terminating Mercer. *See, e.g.*, ECF No. 19-4 (termination letter). The record shows the continuous steps taken by PHH from the time they learned of the call flipping until Mercer was terminated. *See e.g.* ECF No. 19-11 (investigation report describing PHH's actions from mid-July to August, 2010). Further, Nehmsmann was also terminated, and he had never complained about Selitto's comments at the Town

---

[17] *Hubbard v. Ga. Farm Bureau Mut. Ins. Co.*, No. 5:11-CV-290 (CAR), 2013 WL 3964908, at *1 (M.D. Ga. July 31, 2013); *see also Foster v. Univ. of Md. E. Shore*, No. TJS-10-1933, 2013 WL 5487813, at *5-6 (D. Md. Sept. 27, 2013).

[18] "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). However, the plaintiff's "own assertions of discrimination" are not sufficient. *Adam v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011). "When a plaintiff fails 'to present any other evidence—beyond baseless speculation—that [the employer's] stated reason was pretextual, [the] trier of fact 'would be hard-pressed to conclude that [the plaintiff] established pretext.'" *Barrett v. Bio-Medical Application of Md., Inc.*, No.ELH-11-2835, 2013 WL 1183363, at *17 (D. Md. Mar. 19, 2013) (quoting *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007)).

meeting.  *See* ECF No. 19-5 (Nehmsmann termination letter).  "A reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination."  *Holder v. City of Raleigh*, 867 F.2d 823, 829 (4th Cir. 1989) (internal quotation omitted).

Mercer's central arguments are that Bolin participated in the investigation, and Bolin and Quinn-Hamlin did not believe him when he stated that the call flipping process had been approved. *See, e.g.*, ECF No. 1 at ¶¶ 18-21 ("These facts were also patently and unjustly ignored by Ellen Quinn-Hamlin . . . and Kim Bolin."); ECF No. 23-1 at 12-13.  Mercer is upset that he was fired while Bolin and Mackin were not.  *See* ECF no. 23-1 at 12-14.  Assuming, for the sake of argument, that Mackin and Bolin were involved in the call flipping, this does not establish that Mercer was terminated *because of his complaints about Selitto.* At most it establishes that PHH ran a poor investigation and made a poor business decision.[19]

---

[19] *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) ("Even if these investigations were improper or substandard, that does little to help her establish that the reasons given for her termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that her race or gender was the real reason for her termination."); *Countess v. Maryland*, No. ELH-12-02252, 2014 U.S. Dist. LEXIS 5508, at *25 (D. Md. Jan. 16, 2014) ("[T]he employee's mere dissatisfaction with the thoroughness or speed of the employer's investigation does not give rise to liability under Title VII."); *Karpel*, 134 F.3d at 1227-29; *see also Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) ("Once an employer has provided a non-

"A plaintiff is entitled to a trial on the merits of a Title VII claim if he . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination . . . ." *Darvishian v. Green*, 404 F. App'x 822, 828 (4th Cir. 2010). Mercer has not carried this burden. Although Mercer argues that PHH approved the call flipping plan and that he should not have been terminated -- this Court does not "sit as a kind of super-personnel department weighing the prudence of [PHH's] decisions." *DeJarnette v. Corning, Inc.*, 133 F. 3d 293,299 (4th Cir. 1998) (internal quotation marks omitted). No reasonable jury could conclude that but-for[20] Mercer's complaint about Selitto, he would not have been terminated. Accordingly, the Court will grant summary judgment on the retaliation claim.

---

discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.")

[20] Unlike substantive discrimination claims that only require that discriminatory animus be a motivating factor, the plaintiff in a retaliation suit must establish that the adverse employment action would not have occurred absent the protected activity. *See Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2533 (2013).

III. Conclusion

For the reasons stated above, the Defendant's motion for summary judgment on the retaliation claim will be granted.

_____  12/3/14

Date

_____

William D. Quarles, Jr.
United States District Judge